UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

**Civil No.  12cv538 (JNE/TNL)**

CYNTHIA BAKKE,

       Plaintiff,　　　　　　　　　　**REPORT AND RECOMMENDATION**

  v.

CAROLYN W. COLVIN,[1]
ACTING COMMISSIONER OF SOCIAL SECURITY

       Defendant.

---

Lionel H. Peabody, P.O. Box 10, Duluth, MN 55801, for Plaintiff.

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55414, for Defendant.

_____

TONY N. LEUNG, United States Magistrate Judge.

     Plaintiff Cynthia Bakke ("Bakke") disputes the Commissioner's denial of her application for disability insurance benefits ("DIB").  Judicial review in the United States District Court for the District of Minnesota is proper under 42 U.S.C. § 405.  This matter is before the Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court on the parties' cross motions for summary judgment.   *See* 28 U.S.C. § 636(b)(1); D.Minn. LR 72.1-2.  Based on the

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  She is substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).

record and proceedings herein, IT IS HEREBY RECOMMENDED that Plaintiff's motion for summary judgment be granted (Doc. No. 9); and Defendant's motion for summary judgment be denied (Doc. No. 23).

## I.  BACKGROUND

### A.    Procedural History

Bakke was 37-years old when she filed her application for DIB on August 17, 2010, and she alleges a disability onset date of July 25, 2010.  (Tr. 116-24.)[2]  Bakke's application was denied initially and upon reconsideration.  (Tr. 54-58, 75-77.)  She requested a hearing, and the hearing was held on August 3, 2011, before Administrative Law Judge David Washington ("ALJ").  (Tr. 78-79, Supp. Tr. 521-49.)

In his opinion dated August 12, 2011, the ALJ concluded that Bakke was capable of performing jobs such as cleaner and laundry worker, which exist in significant numbers in the national economy.  (Tr. 21.)  Therefore, the ALJ found Bakke was not under a disability, as defined in the Social Security Act, from July 25, 2010 through the date of the ALJ's decision.  (*Id.*)  Bakke requested review of the ALJ's decision by the Appeals Council.  (Tr. 8-9.)  The Appeals Council denied review on December 28, 2011 (Tr. 1-5), and the ALJ's decision became the final decision of the Commissioner of Social Security.  *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner).  Bakke initiated the present action for judicial review on March 1, 2012.

---

[2] The Court uses the abbreviation "Tr." to reference the Administrative Record, Doc. No. 18, and "Supp. Tr." to refer to the Supplemental Administrative Record, Doc. No. 19. The first administrative record submitted to the Court [Doc. No. 8] was incomplete and is not referenced herein.  *See* Orders dated October 11 and 31, 2012.

**B.     Employment History**

Bakke worked as a youth treatment specialist from November 1995 through April 1999.  (Tr. 213.)   From August 2001 through June 2004, she was a volunteer coordinator for Boys & Girls Club.  (*Id.*)  Bakke worked part-time as a guardian ad litem in Duluth from April 2002 through December 2009.  (*Id.*)  She worked as a youth shelter worker for Lutheran Social Services in Duluth on two occasions, June 1999 through August 2002, and for her last term of employment from April 2010 through July 2010.  (*Id.*)

**C.     Medical Records**

**1.     Before the Alleged Onset Date**

Bakke has a long history of mental health treatment, with a suicide attempt and polysubstance abuse as a minor.  (Tr. 234-237.)  In 2001, at age 28, she was treated for depression and mood swings at the Human Development Center.  (Tr. 253-56.)  At that time, she worked part-time at a youth crisis center.  (Tr. 253.)  She was diagnosed with major depression, PTSD related to prior childhood and marital abuse, and "Rule Out" bipolar disorder.[3]   (Tr. 256.)  She had upward mood swings for a day or two, but functioned "quite well" during a high mood swing.   (Tr. 257.)

In 2008, Bakke was married to her third husband and was suffering undue stress caring for her two biological children and two foster children.  (Tr. 259.)  Three of the children had special needs.  (*Id.*)  Bakke was also working part-time as a guardian ad

---

[3] "Although not part of the formal DSM-IV convention, many clinicians also use the term "Rule Out" just prior to a diagnosis to indicate that not enough information exists to make the diagnosis, but it must be considered as an alternative."  Wayne G. Siegel, Ph.D., L.P. and Gary L. Fischler & Associates PA, *Differential Diagnosis of Substance Use Disorders*, available at http://www.psycheval.com/substance%20_use_disorders.shtml

litem.  (*Id.*)  Dr. Carolyn Phelps diagnosed cyclothymic disorder[4] and rule out bipolar disorder.  (Tr. 263.)  In September 2008, Bakke's psychiatrist, Dr. John Glick, noted that Bakke had mood swings where she was depressed in the winter and hypomanic in the spring.  (Tr. 281-82.)  She now had a harder time functioning during the high mood swings.  (Tr. 281.)  Dr. Glick diagnosed bipolar II disorder,[5] with a GAF score of 52.[6]

---

[4] The essential feature of cyclothymic disorder is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms and numerous periods of depressive symptoms.  *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 298 (American Psychiatric Association 4th ed. text revision 2000).  The hypomanic symptoms are of insufficient number, severity, pervasiveness or duration to meet the full criteria of a manic episode, and depressive features are of insufficient number, severity, pervasiveness or duration to meet the full criteria for a major depressive episode.  *Id.*  There is a 15-50% risk that a person with cyclothymic disorder will develop bipolar I or II disorder.  *Id.* at 399.

[5] The essential feature of bipolar II disorder is a clinical course characterized by the occurrence of one or more major depressive episodes accompanied by at least one hypomanic episode.  *DSM-IV-tr* at 368.  A hypomanic episode lasts at least four days with persistent elevated, expansive or irritable mood.  *Id.*  During the mood disturbance, three or four of the following symptoms must be present to a significant degree:  inflated self-esteem or grandiosity; decreased need for sleep; more talkative or pressure to keep talking; subjective racing thoughts or flight of ideas; distractibility; increase in goal-directed activity or psychomotor agitation; and excessive involvement in pleasurable activities that have a high potential for painful consequences.  *Id.*

[6] The Global Assessment of Functioning Scale (GAF) is a numeric scale of 0 to 100, used by clinicians to subjectively rate the severity of the social, occupational and psychological functioning of adults.  *DSM-IV-tr* at 32.  GAF scores of 41-50 indicate serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.* at 34.  Scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  Scores of 61-70 indicate some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.*

(Tr. 282.)  In August 2009, Bakke was diagnosed with premenstrual dysphoric disorder[7] and started on Sarafem,[8] which was helpful.  (Tr. 354-55.)

Bakke's work as a guardian ad litem ended in December 2009.  (Tr. 213.)  She was doing well in the first quarter of 2010, and began part-time work in April 2010.  (Tr. 348-50, 362.)  In June 2010, however, Bakke had a two week episode of upward mood with reckless, impulsive behavior and alcohol use.  (Tr. 361.)  Nurse Nicole Erdmann, under Dr. Glick's supervision, diagnosed bipolar II disorder, and increased Bakke's medications.  (Tr. 345, 361.)  At the end of June, Bakke decreased her work schedule to minimize her stress.  (Tr. 360.)  She was doing much better.  (*Id.*)

### 2.     After the Alleged Onset Date

On July 27, 2010, Dr. Glick discontinued Prozac because it might have caused Bakke's recent high moods, and he increased her divalproex.[9]  (Tr. 359.)  Several days later, Bakke told Dr. Phelps she had an episode of manic behavior with a hallucination.  (Tr. 344.)  On mental status examination, her speech was normal in rate and rhythm, and she did not have racing thoughts.  (*Id.*)  Dr. Phelps wrote, "D/C her employment in a planful way[.]  [S]ees that the shift work did not suit her or her family well[.]  [S]he believes this was the right thing to do . . ."  (*Id.*)  A week later, Bakke was doing better

---

[7] The essential features of premenstrual dysphoric syndrome are markedly depressed mood, marked anxiety, marked affective lability; and decreased interest in activities, occurring in the last week of the luteal phase in most menstrual cycles during the past year.  *DSM-IV-tr* at 771.

[8] Sarafem is a brand name for the drug fluoxetine [Prozac is another brand name for fluoxetine], which is used to treat depression, panic attacks, bulimia, and premenstrual dysphoric disorder.  WebMD, Drugs & Medications – Sarafem Oral, available at http://www.webmd.com/drugs/drug-19825-Sarafem+Oral.aspx?drugid=19825&drugname=Sarafem+Oral

[9] Divalproex, also sold under the brand name Depakote, is indicated for the treatment of manic episodes associated with bipolar disorder.  *PDR* at 435-37.

back on Prozac, but she was under greater stress. (Tr. 343.) On August 13, 2010, Nurse Erdmann noted Bakke was doing fine. (Tr. 444.) Bakke's mental status examination was normal, and her PHQ-9 score[10] was five. (*Id.*)

Just a few days later, Bakke told Dr. Phelps she recently felt suicidal and lost her temper. (Tr. 341.) She reported her moods were aggravated by PMS. (*Id.*) She felt better after her PMS ended but was suffering her usual sleepiness and fatigue associated with seasonal affective disorder. (Tr. 339.) Bakke said she would start using her light therapy box after her upcoming camping trip. (*Id.*) She experienced increased fatigue after cutting back on her caffeine intake. (Tr. 437.) She was undergoing psychological upheaval in her home life. (*Id.*) On September 17, 2010, Bakke told Dr. Phelps that she handled her PMS symptoms better, but she wanted to work on her difficulty controlling rage. (Tr. 435.) The next month, Bakke was suffering extreme fatigue. (Tr. 433.)

Bakke underwent a psychological consultative examination with Dr. Marlin Trulsen on October 19, 2010, at the request of the SSA. (Tr. 375-80.) Dr. Trulsen noted Bakke had a B.A. degree in behavioral management, and her last employment was part-time at a crisis shelter. (Tr. 375.) Bakke quit her job due to allergies and mood swings, quitting before she could be terminated. (Tr. 376.) She similarly quit her previous job as a guardian ad litem to avoid being terminated. (*Id.*) Bakke explained that she could not meet her minimal job responsibilities while in a depressive period,

---

[10] The Personal Health Questionnaire Depression Scale (PHQ-9) is a nine question self-evaluation used to rate the severity of depressive symptoms. *PHQ-9* available at http://patienteducation.stanford.edu/research/phq.pdf A score of 15 or more is considered major depression, and a score of 20 or more is considered severe major depression. *Id.*

and she used her manic periods to get caught up. (*Id.*) Although Bakke had always been depressed, she felt her bipolar symptoms were worsening. (*Id.*) Her depressive phases usually lasted a week and were characterized by suicidal ideation, increased irritability, and increased sleep. (*Id.*) Her manic or hypomanic phases were characterized by increased energy, poor financial management, little sleep, and increase in speech and activity level. (*Id.*) Bakke was in bankruptcy, and her only income was from caring for her foster children. (*Id.*)

Bakke cared for her three children with special needs, and took them to their many appointments. (Tr. 377.) Bakke's hobbies were reading and using the Internet and Facebook. (*Id.*) Her typical daily schedule involved getting up at 7:00 a.m. to get her kids ready for school, driving her husband to work, running errands until 10:00 a.m., cleaning the house until she had lunch with her husband, attending appointments, doing homework with her children, picking her husband up at work, making and eating dinner, doing something with her family in the evening, putting her children to bed, and cleaning the house until 11:00 p.m. (Tr. 377-78.) Bakke received assistance caring for her children from a personal care attendant and a behavioral aide, for approximately ten to fifteen hours per week. (Tr. 378.)

On mental status examination, Bakke was cooperative, alert, oriented, and pleasant, her affect was full, insight and judgment were intact, she had normal speech and thoughts, depressed mood, guilt, hopelessness, and she reported difficulty making decisions. (Tr. 378.) She had adequate memory, average digit span, and average to

high average IQ. (Tr. 379.) Dr. Trulsen diagnosed bipolar I disorder,[11] dysthymic disorder,[12] and a GAF score of 55-65. (*Id.*) He opined that Bakke ranged from no impairment to possibly marked impairment when she experienced a peak in a depressive or manic episode. (Tr. 380.) Bakke's manic episodes would affect her employment because there were noticeable changes in her behavior. (*Id.*)

On October 14, 2010, Bakke told Nurse Erdmann she was going to be tested for sleep apnea. (Tr. 443.) She complained of weight gain and increased daytime fatigue. (*Id.*) Bakke denied hypomania, but she had PMS symptoms. (*Id.*) Her PHQ-9 score was 21, indicating severe major depressive disorder. (*Id.*) About ten days later, Bakke was sleeping twelve hours per day. (Tr. 431.) She asked her husband for help with the children. (*Id.*) On October 28, 2010, Bakke had decreased motivation, and her affect was apathetic. (Tr. 442.) She scored 23 on the PHQ-9, indicating severe major depressive disorder. (*Id.*) Her Prozac was increased. (*Id.*) Her poor energy and motivation continued in early November. (Tr. 430.)

Bakke reported having a manic episode near the end of October. (Tr. 429.) About two weeks later she felt confused, foggy and "dragged out." (*Id.*) On December 6, 2010, Bakke's affect was bright, and she had good energy. (Tr. 428.) She reported having good results with use of a CPAP[13] to treat sleep apnea. (*Id.*)

---

[11] The essential feature of bipolar I disorder is a clinical course characterized by one or more manic episodes or mixed episodes, and often individuals have also had one or more major depressive episodes. *DSM-IV-tr* at 382.

[12] The essential feature of dysthymic disorder is a chronically depressed mood for most of the day, for more days than not, for at least two years, without a symptom-free interval of more than two months. *DSM-IV-tr* at 376-77.

[13] CPAP stands for continuous positive airway pressure. *See* CPAP machines: Tips for avoiding 10 common problems, Mayo Clinic available at http://www.mayoclinic.com/health/cpap/SL00017. A CPAP is a medical device that

On January 3, 2011, Bakke reported having occasional hallucinations and increased anxiety, but she was less quick to lose her temper. (Tr. 427.) By that time, some of her anxiety producing issues had resolved, and she was better overall. (*Id.*) Dr. Phelps noted that Bakke needed to get reconnected with psychiatry, and Bakke did so the following week. (*Id.*) Nurse K. Johnson noted Bakke had been hearing voices, seeing shadows, and having mood swings over the last few weeks. (Tr. 441.) Bakke was trying to avoid urges to spend money and stay up all night. (*Id.*) On mental status examination, Bakke's speech was rapid, and she was fidgety. (*Id.*) Nurse Johnson tapered Bakke's Prozac and started risperidone.[14] (*Id.*) On January 14, 2011, Bakke told Dr. Phelps her hallucinations and urge to spend money had increased. (Tr. 426.)

Bakke attended an appointment with Dr. David Hutchinson at Lester River Medical Clinic on January 25, 2011, to establish care for leg and foot swelling. (Tr. 517.) Bakke felt her mental impairments were "fairly well treated" with Risperdal, Prozac, BuSpar[15] and Depakote, but she disliked the weight gain and edema associated with Depakote. (*Id.*) On examination, Dr. Hutchinson noted Bakke was jovial and upbeat, with fast but not quite pressured speech. (*Id.*) Bakke also reported her sleep apnea was controlled, and her daytime sleepiness was gone. (*Id.*)

But on January 31, 2011, Bakke told Nurse Johnson she had no improvement on risperidone. (Tr. 440.) Her moods were the same; she was seeing shadows in her

---

supplies a constant and steady air pressure through a hose and a mask or nose piece. *Id.*

[14] Risperidone, also sold under the brand name Risperdal, is indicated for the short-term treatment of acute mania or mixed episodes associated with bipolar I disorder. *Physician's Desk Reference* ("*PDR*") 1742-43 (59th ed. 2005).

[15] BuSpar, a brand name for the drug buspirone, is used to treat anxiety. WebMD, Drugs & Medications – BuSpar Oral available at http://www.webmd.com/drugs/drug-9036-BuSpar+Oral.aspx?drugid=9036&drugname=BuSpar+Oral

peripheral vision; and although she was sleeping, she felt she could go without sleep. (*Id.*) On mental status examination, she was anxious and her thoughts were racing. (*Id.*) Her PHQ-9 score was 12, and she had thoughts of suicide. (*Id.*) Nurse Johnson recommended tapering Depakote and starting lithium.[16] (*Id.*) In a progress note on February 1, 2011, Dr. Hutchinson noted Bakke was "working desperately" with her mental health providers to find different medications that would not promote weight gain. (Tr. 514.)

Bakke's mood was very poor related to her PMS on February 10, 2011. (Tr. 425.) She continued to be irritable and depressed five days later. (Tr. 424.) Bakke had a consultation with a psychiatric pharmacist the next week. (Tr. 468.) Dr. Mark Schneiderhan noted Bakke was being treated for side effects from Depakote. (*Id.*) Bakke said she had episodes of agitation and irritability that lasted two hours, more common when she was under stress. (*Id.*) This was sometimes accompanied by visual or auditory hallucinations. (*Id.*) She was presently euthymic. (*Id.*)

At her psychiatric appointment on February 25, 2011, Bakke said she was having severe episodes of agitation that came from nowhere, with ongoing increased anxiety. (Tr. 439.) Bakke's quasi-hallucinations were possibly connected to anxiety rather than psychosis. (*Id.*) Bakke's mental status examination indicated thoughts of suicide. (*Id.*) Her Prozac was increased, and she was started on propranolol.[17] (*Id.*) On February

---

[16] Lithium, also sold under the brand name Eskalith, is indicated for the treatment of manic episodes, and maintenance therapy prevents or diminishes the intensity of subsequent episodes. *PDR* at 1485.

[17] Propanolol, also sold under the brand name Inderal, is usually used to treat high blood pressure, irregular heartbeats and tremors, and has also been used to control symptoms of anxiety. WebMD, Drugs & Medications – propranolol Oral, available at

28, 2011, Dr. Phelps opined that Bakke did not have anxiety so much as she became stressed and agitated.  (Tr. 423.)  She diagnosed bipolar II disorder.  (*Id.*)

In March 2011, Bakke was working on diet and exercise.  (Tr. 471.)  Her irritability increased, affecting her behavior toward her children.  (Tr. 505.)  She wanted a medication change.  (*Id.*)  Dr. Phelps completed a diagnostic assessment form, diagnosing Bakke with bipolar I disorder, most recent episode depressed.  (Tr. 506.)  She assessed Bakke with a GAF score of 50.  (*Id.*)  Dr. Phelps recommended that Bakke increase her sessions to work on her binge eating and to increase exercise because she was morbidly obese.  (*Id.*)

Dr. Phelps wrote a disability opinion letter for Bakke on March 15, 2011.  (Tr. 472.)  Dr. Phelps changed Bakke's diagnosis from cyclothymic disorder to bipolar I disorder because Bakke had a full blown manic episode the prior summer.  (*Id.*)  Dr. Phelps stated, "My knowledge of Ms. Bakke's ability to function on the job is somewhat limited, as this was never a direct focus of treatment."  (*Id.*)  However, she noted that Bakke had difficulty completing court reports when she was a guardian ad litem.  (*Id.*)  Dr. Phelps also opined that Bakke's work at the Bethany Crisis Center interfered with Bakke's overall functioning in the past.  (*Id.*)  She recommended that Bakke have an independent psychological evaluation to determine her work functioning.  (*Id.*)

When Bakke saw Nurse Johnson on March 28, 2011, she reported that her episodes of irritability had decreased in number and severity.  (Tr. 504.)  Her psychotic symptoms only occurred in times of high stress or anxiety, and Bakke was not sure

risperidone helped.  (*Id.*)  Bakke's mental status examination was normal, and her PHQ-9 score was 8.  (*Id.*)  Nurse Johnson would consider discontinuing risperidone.  (*Id.*)

In April 2011, Bakke reported increased impulsivity, irritability, agitation, and hyper-spending.  (Tr. 500-01.)  In her mental status examination on April 25, 2011, she exhibited pressured speech, elation, racing thoughts, and she reported having a hallucination.  (Tr. 500.)  On May 4, 2011, Bakke told Nurse Johnson her elevated moods happened every spring.  (Tr. 498.)  Bakke appeared distracted, elated, with pressured speech and racing thoughts.  (*Id.*)  She was fidgety and heard voices occasionally.  (*Id.*)  Five days later, Dr. Phelps noted Bakke's affect was bright and appropriate.  (Tr. 497.)  Dr. Hutchinson saw Bakke the next day, and she appeared "activated" but not manic or hypomanic.  (Tr. 508.)

In mid-May 2011, Bakke became irritable and occasionally heard voices.  (Tr. 495-96.)  Her dosage of lithium was increased.  (*Id.*)  Although her mood had been poor, a month later Bakke reported stabilizing after her lithium was adjusted.  (Tr. 494.)  On July 19, 2011, Dr. Phelps noted Bakke's mood was adequate after she had another bout of fatigue treated with Provigil.  (Tr. 492.)  She felt Bakke responded well to recent real life stress.  (*Id.*)  She diagnosed bipolar I disorder, depressed, unspecified degree.  (*Id.*)

### 3.    Nonexamining State Agency Consultants' Opinions

On November 23, 2010, stage agency consultant K. Lovko reviewed Bakke's social security disability file and completed a Psychiatric Review Technique Form regarding Bakke's mental impairments.  (Tr. 383-95).  Lovko indicated that Bakke had mild limitations in activities of daily living, mild limitations in social functioning, and moderate limitations in concentration, persistence or pace, and no episodes of

decompensation. (Tr. 393.) Lovko also completed a Mental Residual Functional Capacity Assessment form. (Tr. 398-401.) She opined that Bakke could understand, remember, and carry out unskilled tasks without special consideration, relate on a superficial basis to coworkers and supervisors, attend tasks sufficiently to complete them, and manage the stress of unskilled work. (Tr. 401.) On March 18, 2011, Dr. James Alsdurf reviewed Bakke's social security disability file upon reconsideration of her disability application. (Tr. 481-83.) He affirmed Lovko's November 23, 2010 RFC opinion. (*Id.*)

### D. Function Reports

Bakke completed a function report for the SSA on September 1, 2010. (Tr. 148-58.) She spent her days caring for her children, doing housework and errands. (Tr. 149.) When manic, she had trouble sleeping; when depressed, she slept too much. (*Id.)* Her hobbies were reading, watching television, cooking and walking. (Tr. 152.) On a weekly basis, she played cards or interacted with others on the Internet. (*Id.*) It was a struggle to do these things if she was depressed or manic. (*Id.*) As often as daily, she was irrational, irritable or agitated. (Tr. 153.) Her mental illness affected her memory, concentration, ability to complete tasks and get along with others. (*Id.*) Her abilities to pay attention and follow instructions varied. (*Id.*) Her ability to handle stress and change in routine had markedly decreased. (Tr. 154.) Her behavior during manic phases was socially unacceptable. (*Id.*) Bakke completed another function report on March 10, 2011. (Tr. 178-85.) She had stress-related agitation, mania and allergic reactions that interfered with her ability to work. (Tr. 178.) Her daily activities remained the same but she had trouble remaining focused, and she was irritable. (Tr. 179.)

When depressed, her hygiene suffered.  (*Id.*)

Bakke's husband wrote a letter to the SSA about Bakke's functioning.  (Tr. 222.) Bakke quit her job as a guardian ad litem when her mental health deteriorated, and she was on the verge of suicide.  (*Id.*)  She improved some while not working and took a part-time job due to financial pressure.  (*Id.*)  She had done this job in the past but now it was overwhelming her.  (*Id.*)  She became suicidal again and also had periods of "riding high" without sleep, and behavior that was out of control.  (*Id.*)  She quit her part-time job knowing she was going to be fired eventually.  (*Id.*)

Bakke's mother also wrote a letter to the SSA about Bakke's functioning.  (Tr. 223-24.)  She said Bakke's mental health was volatile and declining since age 14.  (Tr. 223.)  Her teenage years were characterized by impulsive and self-destructive behavior, leading to a teenage pregnancy and marriage to an abusive felon.  (*Id.*)  After her first divorce, she was in and out of therapy.  (*Id.*)  She married another man in 1995 and divorced after he became emotionally unstable and abusive.  (*Id.*)  Nonetheless, she attended college and worked full-time as a youth treatment specialist.  (*Id.*)  After her second divorce, she met her third husband.  (*Id.*)  She worked at the Boys and Girls Club until the chaos of the job became too much for her.  (*Id.*)  Then, she worked part-time as a guardian ad litem.  (*Id.*)  She excelled until her mood cycles worsened, causing her to miss hearings and deadlines for reports.  (*Id.*)  She quit before she could be fired.  (*Id.*)  She tried to work at a shelter again but the stress and "crazy hours" overwhelmed her, and again she quit before she could be fired for being unreliable, not following procedure, or for personality conflicts.  (*Id.*)

Bakke's mother helped Bakke care for her children throughout her adult life.  (Tr.

224.)  Bakke's mood swings became worse over the last several years, and she was irritable, full of rage, hostile and easily brought to suicidal ideation.  (*Id.*)  She lacked the ability to follow through with plans and tasks.  (*Id.*)

### E.    Hearing Testimony

At the administrative hearing, Bakke testified to the following.  She had worked as a guardian ad litem in juvenile court but when her symptoms increased, she had difficulty with every aspect of her job from timely completing reports to scheduling and visiting with clients.  (Supp. Tr. 525.)  Her mood swings prevented her from getting her work done.  (*Id.*)  She resigned from the job before she could be terminated.  (Supp. Tr. 526.)  Subsequently, she tried working at a youth shelter for three months but she could not function under pressure.  (*Id.*)  Again, she resigned before she could be fired. (Supp. Tr. 527.)  She also had difficulty working the overnight shifts at the shelter because she took Benadryl for allergies and was very drowsy.  (*Id.*)  There was no physical cause found for her sometimes severe allergic reactions, and it was believed that stress contributed to her development of symptoms.  (Supp. Tr. 527, *and see* Tr. 322-24, 368-69, 487-88.)

When Bakke was in an upward mood swing, her thoughts and speech were accelerated, and she made unrealistic plans that she started but could not accomplish. (Supp. Tr. 528.)  She also became impulsive with spending and other destructive behavior.  (Supp. Tr. 529.)  Bakke felt her condition was worsening, having less stability between her mood swings and poor memory.  (*Id.*)  She started having hallucinations during manic episodes over the last year.  (*Id.*)  Her medications were changed whenever they were not working or when they caused side effects.  (Supp. Tr. 530.)

Bakke's low mood swings caused her to sleep most of the day and to struggle to do basic things like taking a shower. (Supp. Tr. 531.) Her husband and mother-in-law had to help with caring for her house and children during these episodes. (*Id.*) Bakke felt suicidal when she was down. (*Id.*) She did nothing except sleep or watch television during her down episodes. (Supp. Tr. 532.)

Her moods cycled both seasonally and during the month. (Supp. Tr. 533.) Her low moods lasted about one week per month, and her high moods lasted from a week to a month, longer in the spring and summer. (*Id.*) Bakke did not believe she could work when she was down because she could barely manage to take a shower. (Supp. Tr. 535.) She could not work during a manic phase because she talked too fast, could not stay on task, and visibly appeared abnormal during those times. (*Id.*)

Bakke's husband also testified at the hearing. (Supp. Tr. 539.) Bakke used to do well at her job at a crisis shelter. (*Id.*) When she tried to return to the same work years later, small things caused her mood to spiral down. (Supp. Tr. 540.) After she quit work, her life was up and down. (Supp. Tr. 541.) When she was down, she stayed in bed after the kids went to school, and later needed help with the kids and house. (Supp. Tr. 541-42.) He believed stress brought on Bakke's low moods and hallucinations. (Supp. Tr. 543.) Her low moods lasted five days to three weeks out of a month. (Supp. Tr. 544.) Her high moods lasted a day or two up to a month. (*Id.*)

Dr. Lace testified as a medical expert at the hearing. (Supp. Tr. 536.) Most recently, Bakke was diagnosed with bipolar II disorder, but she had also been diagnosed with cyclothymic disorder and bipolar I disorder. (*Id.*) Her GAF scores ranged from 50 to 65, generally in the moderate range. (*Id.*) Many of her medical

records did not include GAF scores or discuss the severity of her condition. (Supp. Tr. 537.) Dr. Lace testified that Bakke would have the following work restrictions: brief and superficial contact with coworkers, the general public and supervisors; and routine, repetitive work. (*Id.*) Dr. Lace agreed with Dr. Trulsen's opinion in that there would be periods when Bakke could not function well. (Supp. Tr. 539.)

Mary Harris testified as a vocational expert ("VE") at the hearing. (Tr. 215; Supp. Tr. 545.) She testified that a person of Bakke's age, education, and past work, and who had the impairments and limitations described by Dr. Lace could not perform Bakke's past relevant work but could perform other work including cleaner, Dictionary of Occupational Titles ("DOT") Code No. 381.687.018, and laundry worker, DOT Code 361.685-018. (Supp. Tr. 545-46.) She testified, however, that a person would be unemployable if, due to significant depression or mania, she could not perform her job five days or more per month. (Supp. Tr. 546.)

F.    ALJ's Decision

On August 12, 2011, the ALJ made the following findings and conclusions on Bakke's application.

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> 2.  The claimant has not engaged in substantial gainful activity since July 25, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*) . . . .
>
> 3.  The claimant has the following severe impairments: bipolar II disorder, premenstrual dysphoric disorder, and major depressive disorder. (20 CFR 404.1520(c)). . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404,

Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). . . .

5.  . . . [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she is mentally able to perform work that is no more than simple, routine, unskilled, and repetitive in nature; and she is mentally able to perform work that involves no more than brief and superficial contact with coworkers, the public and supervisors. . . .

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565). . . .

7.  The claimant was born on January 2, 1973 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)). . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 25, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-21.)

In reaching his RFC determination, the ALJ found Bakke's subjective complaints were only partially credible because her complaints were inconsistent with Dr. Lace's testimony that in recent years her GAF scores were in the moderate range.  (Tr. 18.) The ALJ gave significant evidentiary weight to Dr. Lace's mental RFC opinion, because

it was generally consistent with Dr. Trulsen's opinion and Dr. K. Lovko's opinion.  (Tr. 19.)  The ALJ further found that Bakke had not established that she "remains subject to a marked level of impairment" when she experiences the peak of depressive or manic symptoms because none of the treating or nontreating sources "stat[ed] as much."  (*Id.*)  The ALJ quoted Dr. Lace's testimony, "the progress notes . . . don't include GAF scores or very much discussion in terms of what the severity of [claimant's] condition is."  (*Id.*)

The ALJ then cited ten medical records from December 2010 through July 2011 that were inconsistent with Bakke's allegation that she would be absent for an impermissible number of workdays each month based on her marked mental impairments.  (Tr. 19-20.)  The ALJ accorded little weight to the third-party function reports prepared by Bakke's mother and husband because the reports were not "as a general matter," corroborated by the contemporaneous medical records.  (Tr. 20.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

To be entitled to DIB, a claimant must be disabled as defined in the Social Security Act. 42 U.S.C. § 423(a)(E). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). The five steps are (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. *Id.* at § 404.1520(a)(4)(i-v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991.)

**B.      Issues**

Bakke raises three arguments in support of her motion for summary judgment. First, she contends the ALJ erred in finding she did not meet or equal the requirements of Listing 12.04(B). Second, she asserts the ALJ erred by not including frequent periods of marked functional impairment in his RFC determination. Third, Bakke contends the ALJ's credibility determination is contrary to law and not supported by substantial evidence on the record as a whole.

### 1. Listing 12.04

When a claimant meets or equals a listed impairment, her impairment is severe enough that she is disabled without consideration of age, education or work experience. 20 C.F.R. § 404.1520(d). To meet Listing 12.04(B) for affective disorders, a claimant must prove that her affective disorder(s) results in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.04(B). "Marked" is defined in §12.00(C) as more than moderate and less than extreme. Marked limitation may arise "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

Episodes of decompensation are defined in § 12.00(C)(4) as follows:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

Bakke contends the ALJ erred by relying on Dr. Lace's testimony that she did not meet the "B criteria" of Listing 12.04. Dr. Lace agreed with Dr. Trulsen that Bakke's functioning in all areas was markedly impaired when she was at the peak of depressive or manic symptoms, but Dr. Lace did not take this into account. Bakke asserts the ALJ should have considered her frequent fluctuation in functioning to determine whether she met or equaled the listing. Bakke also asserts that she met or equaled the required number of episodes of decompensation based on evidence of significant medication changes, and the need for a highly supportive home environment based on mood swings for a significant portion of each month.

The Commissioner responds that the ALJ determined Bakke had mild restrictions in activities, moderate difficulties in social functioning, moderate difficulties in concentration, and no episodes of extended decompensation based on the opinions of Drs. Trulsen and Lace, and Bakke's treatment records. The Commissioner notes Bakke had only one full blown manic episode, the trigger for her disability application, and her condition improved with medication. The Commissioner contends the record is devoid of objective evidence that Bakke experienced the highs and lows that she claimed.

The following episodes of decompensation, evidenced by exacerbation in symptoms, need for increased treatment, need for a less stressful situation, or

significant alteration in medication are supported by the medical records during the relevant time period. First, in June 2010, just before her alleged disability onset date, Bakke had a two week episode of upward mood with reckless, impulsive behavior and alcohol use. (Tr. 361.) Her medications were increased, and she decreased her work schedule to minimize her stress. (Tr. 345, 360-61.)

Second, in October and into November 2010, Bakke's depressive symptoms increased, and her PHQ-9 scores indicated severe major depression. (Tr. 442-43.) She had to have help from her husband caring for her children. (Tr. 431.) Her Prozac was increased. (Tr. 442.) The Court notes Bakke's fatigue may have affected her depression during this period, and her severe daytime fatigue improved in December 2010, after she was diagnosed with sleep apnea and treated with a CPAP. (Tr. 428.) Bakke, however, had another bout of fatigue requiring treatment with medication in July 2011, despite her treatment for sleep apnea. (Tr. 492.) Bakke also had a long history of fatigue associated with seasonal affective disorder. (Tr. 339.) The causes of Bakke's fatigue appear to be complex, and the record does not support a finding that her fatigue, a symptom associated with both depression and sleep apnea, was resolved by use of a CPAP.

Third, in mid to late January 2011, Bakke had been hearing voices, seeing shadows, and having mood swings. (Tr. 440-41.) On mental status examination on January 10, 2011, she was anxious with racing thoughts, rapid speech, over activity, and abnormal affect, thought process and thought content. (Tr. 441.) Nurse Johnson decreased Prozac and started risperidone. (*Id.*) Bakke reported no improvement with risperidone on January 31, 2011. (Tr. 440.) On mental status examination, Bakke was

anxious with racing thoughts.  (*Id.*)  Nurse Johnson recommended tapering Depakote and starting lithium.  (*Id.*)

Fourth, in April 2011, Bakke reported increased impulsivity, irritability, agitation, and hyper-spending.  (Tr. 500-01.)  In her mental status examination on April 25, 2011, she exhibited pressured speech, elation, racing thoughts, and she reported having a hallucination.  (Tr. 500.)  On May 4, 2011, Bakke told Nurse Johnson her elevated moods happened every spring.  (Tr. 498.)  Bakke appeared distracted, elated, with pressured speech and racing thoughts.  (*Id.*)  She was fidgety and heard voices occasionally.  (*Id.*)

Fifth, in mid-May 2011, Bakke was irritable and occasionally heard voices.  (Tr. 495-96.)  Her dosage of lithium was increased.  (*Id.*)  Although her mood had been poor, a month later Bakke reported stabilizing after her lithium was adjusted.  (Tr. 494.)

Bakke's episodes of decompensation met the listing because they occurred three times in the year 2011, and also averaged once every four months, each episode lasting at least two weeks, beginning on her alleged onset date.  To meet all requirements of Listing 12.04(B) there must also be evidence of marked impairment in daily activities or social functioning or concentration, persistence or pace.  At least one of those aspects of functioning was markedly impaired during Bakke's episodes of decompensation described above, but at other times, her functioning was mildly to moderately impaired.  The listing does not indicate how frequently a claimant's functioning must be markedly impaired to meet the listing.  In Dr. Lace's judgment, however, claimant's functioning was not markedly impaired overall nor were her impairments equal in severity to the listing.  An ALJ may give consideration to a state

agency consultant's or medical expert's particular expertise in social security disability evaluation, and this seems particularly appropriate where the issue is interpretation of a listed impairment. 20 C.F.R. § 404.1527(e)(2)(i). Although the evidence may support more than one conclusion regarding whether Bakke met all requirements of Listing 12.04(B), one of those conclusions was that of the ALJ based on the medical expert's opinion, and should be respected by the Court. Of course, a claimant need not meet or equal a listed impairment to be found disabled, and the evaluation must continue.

## 2. RFC Determination

At steps four and five of the disability evaluation, the ALJ assesses the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv-v). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. . . . The ALJ, however, still bears the primary responsibility for assessing a [claimant's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted). The ALJ considers all of the medical opinions from treating and nontreating sources, 20 C.F.R. § 404.1527(c), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).

Credibility of subjective complaints is another factor in the ALJ's RFC determination. 20 C.F.R. § 404.1545(e); 20 C.F.R. § 404.1529(c)(3). In evaluating a claimant's subjective complaints, the ALJ cannot rely solely on the lack of objective medical evidence, and the ALJ must consider: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain [or other subjective complaint]; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; 5) functional restrictions; and 6) work history. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th

Cir. 1984).  If an ALJ gives good reasons for discrediting a claimant's testimony, courts should defer to the ALJ's judgment.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

Bakke asserts her case could not be decided fairly without considering how often her episodes of marked functional impairment occur and how long they last, and the ALJ failed to do so here.  Bakke contends that although her functioning varies from month to month, she has a minimum of five days per month when she is unable to function due to her low moods, and some days each month when she could go to work during a manic episode but she would be unable to perform tasks properly.  Bakke notes the VE testified that if a person were unable to perform her job five days per month, she would be unemployable.  The ALJ did not discuss whether the evidence showed Bakke would be unable to work five days per month.

The Commissioner contends the ALJ addressed Bakke's fluctuating symptoms when he stated Bakke had not proven that "under her current medication regimen" she "remains subject to" a marked level of impairment at the peak of her depressive or manic symptoms because the record did not contain a medical opinion stating such. The Commissioner notes even Dr. Trulsen found only a potential for marked difficulties in functioning during a peak of symptoms, but he assigned a GAF score of 55-65, indicating only moderate to mild symptoms.  The Commissioner further notes the ALJ addressed Bakke's claim that she would miss an impermissible number of days of work by citing a dozen treatment records undermining her claim.  The only evidence to the contrary, according to the Commissioner, is Bakke's and her husband's testimony.

Bakke asserts the ALJ's credibility finding was in error because the ALJ disregarded her subjective complaints as unsupported by objective medical evidence. The nonexamining state agency consultant [K. Lovko] disregarded Dr. Trulsen's opinion that Bakke would have marked impairments at the peak of depressive or manic episodes because Bakke was never admitted as an inpatient. Bakke, however, contends the record nevertheless showed she was nonfunctional for a number of days each month, and hospitalization is not the only way to prove decompensation.

The ALJ also discounted Bakke's credibility based on Dr. Lace's testimony that many of Bakke's treatment notes did not contain GAF scores or other evidence of the severity of her condition. Bakke asserts this was error because she was assessed a GAF score of 50 on March 14, 2011, and Bakke's PHQ-9 scores between 15-19 indicated moderately severe depression, and scores between 20 and 27 indicated severe major depression. Bakke further asserts the ALJ failed to credit her subjective complaints based on her positive prior work record and the third party observations of her mother and husband. Although the ALJ cited ten treatment notes that he found inconsistent with disabling mental impairments, Bakke contends there were many more treatment notes consistent with severe functional limitations. Specifically, Bakke asserts the ALJ failed to consider the duration, frequency and intensity of her symptoms, and the aggravating factor of her intolerance to stress, so severe it induced her to have hallucinations. Bakke also contends the ALJ failed to consider her need for frequent medication changes, and her side effects from medication.

The Commissioner contends the ALJ properly relied on medical source opinions, treatment notes, and the lack of evidence indicating the severity of Bakke's symptoms in

discounting her subjective complaints. The Commissioner further contends the 55-65 GAF score assessed by Dr. Trulsen and most of Bakke's PHQ-9 scores indicate that she frequently experienced no more than moderate depressive symptoms. The Commissioner also asserts Bakke's activities of caring for her children, doing housework, yard work and errands, attending basketball games and taking her kids skiing are inconsistent with disability. As to side effects from medication, the ALJ noted Bakke's side effects from one medication improved when her dosage was lowered. The ALJ considered the effectiveness of Bakke's medications, noting records that indicated improvement. The Commissioner contends that the same evidence the ALJ used to discount Bakke's credibility could be used to discount the credibility of third-party testimony.

Given the fluctuating nature of the symptoms of bipolar and cyclothymic disorders, the Court agrees that the ALJ should have determined whether Bakke's functional limitations would be frequent and severe enough to prevent her from performing full-time competitive employment, without an impermissible number of absences. *See Andler v. Chater,* 100 F.3d 1389, 1393 *(*8th Cir. 1996) (symptom-free intervals and brief remissions of mental illness are generally of uncertain duration and marked by the impending possibility of relapse") (citing *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C. Cir. 1987))*; see Garrett ex rel Moore v. Barnhart*, 366 F.3d 643, 653 (8th Cir. 2004) (ALJ erred in finding claimant's depression was controlled by medication where records indicated claimant continued to suffer episodic bouts of major depression.) Although medication changes sometimes resulted in improvement, and the ALJ focused his decision on records reflecting that fact, Bakke's symptoms continued to fluctuate

and require additional changes in treatment during the relevant time period. *See Carey v. Astrue*, No. 4:11CV212FRB; 2012 WL 1033341 at *22 (E.D.Mo. March 27, 2012) (remanding where "the record as a whole show[ed] that subsequent to the reports of plaintiff's relatively adequate functioning upon which the ALJ relied, plaintiff again experienced hallucinations, mood swings and sleep disturbances despite continued therapy and adjustments to multiple psychotropic medications.")

The ALJ erred by focusing his decision on periods when Bakke was doing better, and apparently assuming, despite her long history of fluctuating moods, that her improvement would last. *See Clark v. Astrue*, Civil No. 10-4908 (JRT/LIB), 2012 WL 1658894 at *9 (D.Minn. March 30, 2012) (remanding where record did not support ALJ's finding that the records showed stabilization and improvement of bipolar disorder because claimant's moods fluctuated.) The ALJ's error is evidenced by his statement that Bakke "under her current medication regimen" failed to prove that she remained "subject to a marked level of impairment at the peak of her depressive or manic symptoms." Perhaps Bakke's stabilization on lithium in July 2011 would last, but the ALJ could not know that when he issued his decision on August 3, 2011. Bakke was not stable on medication from July 2010 through July 2011; her moods fluctuated, and her medications were changed or increased. Her moods, exacerbated by stress, caused periods of hypomanic episodes severe enough to cause hallucinations, and periods of depression severe enough to result in PHQ-9 scores reflecting severe major depression.

For the same reasons, the ALJ's credibility analysis was flawed because the duration, frequency and aggravating factors related to Bakke's symptoms support her

subjective complaints of inability to engage effectively in full-time competitive employment. Although she had improvement at times, her exacerbations continued. Bakke's past educational and employment achievements, despite her significant impairments, supports her motivation to work and her credibility. *See Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (claimant with impressive work record who availed himself of many treatment modalities for subjective complaints of pain was credible).

The fact that Dr. Phelps declined to give an RFC opinion is insufficient reason for the ALJ to conclude Bakke's impairments were not as severe as alleged. Dr. Phelps explained that her focus in therapy was not on employment issues (Tr. 472), and her treatment records reflect that her focus with Bakke was on her mood swings and their effect on her relationship with her husband and ability to care for her children. It was reasonable for Dr. Phelps to recommend a psychological assessment specific to employment, without creating an inference that Dr. Phelps believed Bakke was employable in full-time competitive employment.

Finally, contrary to the ALJ's finding, the third-party reports offer insight into Bakke's impairments and functioning, consistent with the record as a whole and acknowledging the role of stress on Bakke's decompensation. Therefore, substantial evidence in the record establishes Bakke would miss work due to her mental impairments, on average, five or more days per month, and the ALJ should have included this limitation in his RFC finding. *See Black v. Barnhart*, 237 F.Supp.2d 1099, 1109 (S.D. Iowa 2002) (where claimant who suffered from bipolar disorder was unable to work on a consistent basis, and VE testified there was no competitive work the

claimant could do, reversal for award of benefits was appropriate) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984)).

### 3. Vocational Evidence

The VE testified that a person would be unemployable if her mental impairments precluded her from working five or more days per month.  (Supp. Tr. 546.)  Because substantial evidence in the record supports a finding that Bakke's mental impairments would cause her to be absent or otherwise unable to work at least five days per month, the VE's testimony is substantial evidence of disability.  *See Porch v. Chater*, 115 F.3d 567, 572-73 (8th Cir. 1997) (remanding for award of benefits where claimant's testimony should have been credited, and when it was, the VE testified that no jobs existed for such a person).

## III.  RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Plaintiff's motion for summary judgment (Doc. No. 9) be **GRANTED**, and pursuant to Sentence 4 of 42 U.S.C. § 405(g), the case be remanded for reversal and award of benefits;

2. Defendant's motion for summary judgment (Doc. No. 23) be **DENIED**; and

3. If this Report and Recommendation is adopted, that judgment be entered accordingly.

DATE:  July 1, 2013  _____*s/ Tony N. Leung*_____
TONY N. LEUNG
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **July 17, 2013**.