UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cynthia Bakke,

Plaintiff,

v.                                                    Civil No. 12-538 (JNE/TNL)
                                                      ORDER
Carolyn W. Colvin, Acting Commissioner
of Social Security,

Defendant.

Plaintiff Cynthia Bakke ("Bakke") seeks judicial review of the Commissioner of Social

Security's final decision to deny her application for Social Security disability benefits. The

parties brought cross-motions for summary judgment. The case was referred to the magistrate

judge, who issued a Report and Recommendation on July 1, 2013 recommending that Plaintiff's

motion for summary judgment be granted, Defendant's motion for summary judgment be denied,

and the case be remanded for reversal and award of benefits. Defendant objected and Plaintiff

responded. The Court has conducted a de novo review of the record. *See* D. Minn. LR 72.2(b).

For the reasons discussed below, the Court declines to adopt the Report and Recommendation.[1]

Bakke alleged a disability onset date of July 25, 2010. Her application for disability

insurance benefits was initially denied in November 2010 and again upon reconsideration in

March 2011. An Administrative Law Judge ("ALJ") conducted a hearing in August 2011, after

which he found that Bakke had bipolar II disorder, premenstrual dysphoric disorder, and major

depressive disorder. The ALJ found Bakke credible with respect to her statements concerning

the types of symptoms she suffered as a result of her impairments. But he found that "the

claimant's statements concerning the intensity, persistence and limiting effects of these

---

[1]    References to the Social Security Administrative Record (ECF No. 18) are cited as "AR
[page number.]"

1

symptoms are partially credible to the degree that they are not generally consistent with the evidence of record taken as a whole."  He concluded that Bakke had the residual functional capacity ("RFC") to perform a full range of work with some limitations and denied her application for disability insurance benefits. The Appeals Council denied review of the ALJ's decision.  Bakke then sought judicial review.

Bakke first asserts that the ALJ erred in finding that her impairments do not meet or equal the requirements of Listing 12.04.  With respect to the ALJ's conclusion that Bakke does not have impairments that meet or medically equal these criteria, the magistrate judge concluded that "[a]lthough the evidence may support more than one conclusion regarding whether Bakke met all requirements of Listing 12.04(B), one of those conclusions was that of the ALJ based on the medical expert's opinion, and should be respected by the Court."  Although the Court does not agree with the magistrate judge's characterization of Bakke's mood cycles as "episodes of decompensation," as defined  in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4), the Court agrees with the recommendation to respect the ALJ's conclusions regarding Bakke's failure to meet the requirements of Listing 12.04(B).  The Court therefore adopts only this portion of the Report and Recommendation.[2]

Bakke next challenges the ALJ's RFC and credibility determinations.  "The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities, despite his or her physical or mental limitations." *Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007) (quotation omitted).  "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own

---

[2]     Although the magistrate judge refers to Bakke's "decompensation," the Court notes that no medical expert ever referred to Bakke's episodes as such.  Lovko stated that there had been "no apparent period of decompensation."  AR 401.  Dr. Lace testified that there have been no "episodes of decompensation . . . of an extended duration."  Hr'g Tr. 16.

description of her or his limitations, as well as medical records, and observations of treating physicians and others." *Id.* Overall, the ALJ's findings regarding RFC "must be supported by some medical evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). In evaluating a claimant's subjective complaints, "the ALJ must consider objective medical evidence, as well as any evidence relating to the so-called *Polaski* factors, namely: (i) a claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) dosage, effectiveness, and side effects of medication; and (v) functional restrictions." *Id.* at 801. Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility." *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). "An ALJ may not reject a claimant's subjective complaints . . . based merely on the absence of objective medical evidence." *Roberson*, 481 F.3d at 1025. "But an ALJ may take the claimant's medical records into account when determining his or her credibility, and may discount the claimant's subjective complaints if there are inconsistencies in the record as a whole." *Id.* An ALJ who finds the claimant not credible must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Guilliams*, 393 F.3d at 801 (internal quotation marks omitted).

Bakke argues that the ALJ failed to include consideration of her frequent highs and lows in his RFC determination and that the ALJ's credibility determination—finding her only partially credible—was contrary to law and not supported by substantial evidence. Bakke asserts that the ALJ did not discuss whether the evidence showed that she would be unable to work five days per month—a limitation that, according to the vocational expert, would make a person

3

unemployable. The magistrate judge agreed, stating: "the ALJ should have determined whether Bakke's functional limitations would be frequent and severe enough to prevent her from performing full-time competitive employment, without an impermissible number of absences." The magistrate judge concluded that the ALJ "erred by focusing his decision on periods when Bakke was doing better, and apparently assuming, despite her long history of fluctuating moods, that her improvement would last."

It is apparent from the ALJ's decision that the ALJ did, in fact, consider the cycling and fluctuating nature of Bakke's impairments. He discussed her bipolar and major depressive disorders, mood swings, manic and depressive symptoms, and medication changes. The ALJ found Bakke credible with respect to her statements regarding the existence of these symptoms and that they were caused by her medical impairments (bipolar II disorder, premenstrual dysphoric disorder, and major depressive disorder). In finding Bakke only partially credible with respect to the severity of these symptoms, the ALJ relied heavily on the testimony of the medical expert, Dr. Lace. Dr. Lace testified that Bakke suffers from cycling mood disorders, acknowledging that "there's definitely a bipolar cycle going on." Hr'g Tr. 14. He noted the recent global assessment of functioning ("GAF") scores between 50-65, "which generally speaking are in the moderate range." *Id.* Dr. Lace commented that the medical treatment notes did not include much discussion regarding the severity of Bakke's symptoms. Based on the record, Dr. Lace concluded that several restrictions would be appropriate for Bakke: there would be "limitations socially because of her mood lability, and those would include maybe for at most brief and superficial contact with coworkers, the general public, and supervisors. And in terms of her actual work on the job, routine, repetitive types of work would be most appropriate because of the mood lability." *Id.* at 15. Dr. Lace opined that Bakke would have mild

restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace.  When examined by Bakke's attorney as to whether his opinions would change when Bakke "is in the down part of the bipolar cycle," Dr. Lace replied that he was "looking at it as a—at the record as a whole, taking into account what her diagnoses are in the—on the mood swings."  *Id.* at 16.  Dr. Lace also agreed that "there would be periods where it would be difficult for [Bakke] to function well."  *Id.* at 17.

The ALJ accorded Dr. Lace's testimony "significant evidentiary weight," finding it "generally consistent with the evidence of record overall," including the report prepared by Dr. Marlin Trulsen and the mental RFC assessment provided by K. Lovko.  Dr. Trulsen reported that Bakke had left her prior jobs because she thought she was likely going to be terminated and that Bakke's "typical day" included: waking up at 7:00 a.m.; preparing breakfast for the children; getting the children "up and going for their day;" driving her husband to work; running errands and shopping; cleaning the home; meeting her husband for lunch and dropping him off at work; going to appointments for the children or making phone calls; preparing snacks for the children and reviewing their homework; picking up her husband from work; preparing dinner; participating in an evening activity with her husband; cleaning the house after the children go to bed; preparing the children's clothes and needs for the next day; and going to bed at 11:00 p.m.  AR 377-78.  According to Dr. Trulsen, "Ms. Bakke reported an adequate level of social life and social acquaintances and as capable of doing her own cleaning, shopping, dishes, cooking, yard work, and laundry."  *Id.* at 378.  Dr. Trulsen concluded that Bakke's "general mental capacity for understanding, remembering, following instructions, sustaining attention, concentrating, carrying out work-like tasks with reasonable persistence or pace, respond[ing] appropriately to brief and

superficial contact with coworkers and supervisor, as well as tolerating stress and pressures typically found in an entry-level workplace would all appear to show a range of impairment from none as would appear to be more currently present to a potentially marked level of impairment when Ms. Bakke experiences her peak of either depressive or manic symptom[s] as part of her bipolar process." *Id.* at 380.

Lovko, a non-examining state agency psychological consultant, also reviewed the medical records and commented that Bakke left her past jobs "because she felt she was going to be fired, but was not actually fired." *Id.* at 400.  He restated Dr. Trulsen's comments regarding Bakke's range of impairment and Bakke's schedule for a typical day.  He stated, based on his review, that Bakke's allegations of symptoms appeared credible, "although allegation of severity of functioning is not supported by a totality of ME in file." *Id.* at 401.  Lovko stated that "[t]here have been no hospitalizations and no apparent periods of decompensation," and that while there was a statement given "that [Bakke is] likely to have difficulties in period of decompensation, there is nothing to suggest serious episodes of decompensation as noted by lack of [inpatient] admits." *Id.*  Lovko concluded that "[t]he evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in many work environments," she "can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors," she "can attend to task for sufficient periods of time to complete tasks," and she "can manage the stresses involved with unskilled work." *Id.*

The ALJ found that Bakke's allegations of frequent periods of marked impairment were "not generally consistent with the treating evidence of record."  He cited ten medical records that discussed Bakke's medication routine, regulation of moods, and overall mood lability.  Contrary to the magistrate judge's conclusion that the ALJ focused solely on periods when Bakke was

doing well, the medical records upon which the ALJ relied provided information regarding Bakke's mood lability and stabilization *overall*, not only how Bakke was feeling on the particular day she was seen.  There is also no indication that the ALJ made any assumptions regarding the permanent success of Bakke's current medication regime.

The ALJ further noted that the medical records contained nothing corroborating Bakke's subjective claims.  Bakke contends that the ALJ erroneously discounted her complaints based on the lack of objective evidence—but the medical records Bakke submitted also contained no *subjective* evidence supporting her claims.  As the ALJ noted, "[t]he claimant has not established by a preponderance of the evidence that, under her current medication regimen, she remains subject to a marked level of impairment, when she experiences her peak of either depressive or manic symptoms, because the case record includes opinions from neither treating nor nontreating sources stating as much."  There were no medical opinions regarding the severity of Bakke's symptoms, there were no GAF scores suggesting marked impairment, and Bakke had not been admitted to the hospital for her symptoms.  Her four most recent PHQ-9 scores were not indicative of severe depression.

Bakke's treating psychologist, Dr. Phelps, wrote a letter on March 15, 2011, stating that she had been treating Bakke for her bipolar disorder since 2008 and had been seeing Bakke on a weekly to monthly basis.  AR 472.  Dr. Phelps explained that Bakke's ability to function on the job "was never a direct focus of treatment" and so she only had limited knowledge of such.  Dr. Phelps was "aware that [Bakke] had difficulty completing court reports in a timely fashion while working as a guardian ad litem," and "that her work at the Bethany Crisis Shelter interfered with her overall level of functioning."  *Id.*  Dr. Phelps further noted that "[i]t is possible that some of

the interference in her functioning from her most recent position at the Bethany Crisis Shelter

may have been related to shift work." *Id.*

Although Bakke's treating psychologist could not provide an opinion regarding Bakke's

ability to work, the medical records before the ALJ included treatment notes from Bakke's office

visits.  These treatment notes indicate that Bakke was treated for her bipolar disorder (originally

diagnosed as Cyclothymic Disorder) by two psychologists: Dr. Phelps and Dr. Anderson.  The

notes from 2010 show that, between these two psychologists, Bakke was, at times, seen on

almost a weekly basis.  In 2011, the treatment notes from Bakke's visits with Dr. Phelps indicate

that Bakke was seen approximately two to three times per month.  Between August 24, 2010 and

March 8, 2011, Bakke was seen on at least seventeen occasions by a psychologist treating her for

her bipolar disorder.

Bakke correctly notes that these treatment records reveal a fluctuation in her symptoms.

But she points to no specific medical records supporting her claims that her mood fluctuations

were of such severity that she was unable to function.  At the hearing before the ALJ, Bakke

testified generally about her symptoms, but did not point to any specific episode of

decompensation or time period during which she was severely impaired.  And despite the

frequency of her visits with her treating psychologists, none of the treatment notes indicate that

Bakke had been so impaired by her manic or depressive symptoms that she was as unable to

function as she claims to be.

For example, Bakke testified that when she was in a depressive episode, which happened

about one week out of every month, she could barely move from the bed to the couch and that

taking a shower was a "massive effort."  Hr'g Tr. 9.  But none of the treatment notes even hint at

such a level of impairment.  The notes reveal that Bakke at times reported she felt "confused,"

"foggy," and "dragged out," or reported a "down and irritable mood," but none of the notes indicate a mood fluctuation so severe that Bakke could barely move from the couch or take a shower.  AR 458, 465.  In fact, the week that Bakke reported the "confused, foggy, dragged out feeling," she also reported that she and her husband "still date once a week."  *Id.* at 458.  Even when Bakke first started to report occasional hallucinations, the treatment notes indicated that Bakke also reported that "overall . . . things have been going well." *Id.* at 460.  If for one week out of every month Bakke was totally incapacitated by her depressive mood, and for another week out of every month she was incapacitated by her manic mood, then it would be reasonable to expect some notation of this incapacity to appear within the treatment records—especially when Bakke was seen almost weekly by a psychologist for the mental disorder for which she claims disability.

Overall, there was a lack of objective *and* subjective evidence in the medical record to substantiate Bakke's claims regarding the severity of her symptoms, and the ALJ identified medical records that were inconsistent with Bakke's claims.  An ALJ "may discount the claimant's subjective complaints if there are inconsistencies in the record as a whole," *Roberson*, 481 F.3d at 1025, and if the ALJ finds the claimant not credible, he must "detail the reasons for discrediting the testimony and set forth the inconsistencies found," *Guilliams*, 393 F.3d at 801. That is precisely what the ALJ did here.  "The ALJ is responsible for deciding questions of fact, including the credibility of a claimant's subjective testimony about her limitations." *Casey*, 503 F.3d at 696.   "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  *Id.* (internal quotation marks omitted); *see also Guilliams*, 393 F.3d at 801 ("We do not re-weigh the evidence presented to the ALJ and we defer to the ALJ's determinations regarding the credibility of

testimony, so long as they are supported by good reasons and substantial evidence." (citations omitted)).

Bakke's argument that the ALJ erred by not considering her frequent periods of marked functional impairment in his RFC determination also fails. First, as explained above, the ALJ did not ignore the fluctuations in Bakke's symptoms and focus solely on the periods during which her symptoms had abated. Rather, he acknowledged the fluctuation and cycling of her impairments but found that Bakke failed to show that there was evidence—objective or subjective—in the medical record to indicate that these fluctuations resulted in marked impairments that would cause her to miss an impermissible number of days from work. Bakke focuses on Dr. Trulsen's statement that Bakke could have a "potentially marked level of impairment" during the peaks of her depressive or manic symptoms. Dr. Lace testified that there "would be periods where it would be difficult for [Bakke] to function well." Neither of these statements provides conclusive evidence that Bakke did, in fact, suffer from marked levels of impairment during the peaks of her symptoms, nor do they provide evidence regarding the frequency or number of days per month that Bakke would suffer from such alleged impairment. The ALJ did not err in concluding that Bakke failed to establish by a preponderance of the evidence that she was subject to a marked level of impairment that would cause her to miss five or more days of work per month.

In making an RFC determination, the ALJ was required to "consider all relevant evidence," including the claimant's subjective complaints, the medical records, and the observations of treating physicians and others. *Roberson*, 481 F.3d at 1023. The ALJ's findings "must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803. Here, the ALJ's findings regarding Bakke's RFC were supported by Dr. Lace's testimony, which was based on

the record as a whole—including the psychological treatment notes—and consideration of

Bakke's fluctuating symptoms.  The ALJ's findings were also supported by Lovko's mental RFC

assessment, in which Lovko stated that he did not find support for Bakke's claims regarding the

severity of her symptoms.  The medical records contained information suggesting that Bakke's

symptoms were improving and her mood was stabilizing.  Bakke focuses on the fact that her

medical records continued to indicate a fluctuation in her symptoms.  The ALJ did not conclude

that Bakke's symptoms had fully stabilized or that she would no longer have mood

fluctuations—only that there was nothing to support her claims regarding the *severity* of these

fluctuations.  The medical records demonstrating continued ups and downs do not provide

evidence that the ups and downs were of such severity that Bakke would suffer from marked

impairments during each episode and would miss an impermissible number of work days.[3]

Overall, "[t]he court will affirm the ALJ's decision if it is supported by substantial

evidence on the record as a whole."  *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)

(internal quotation marks omitted).  "Substantial evidence is relevant evidence that a reasonable

mind would accept as adequate to support the Commissioner's conclusion."  *Id.* (internal

quotation marks omitted).  "[A]n administrative decision is not subject to reversal simply

because some evidence may support the opposite conclusion."  *Id.*  "If, after reviewing the

record, the court finds it is possible to draw two inconsistent positions from the evidence and one

of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Id.*;

---

[3]     Bakke also asserts that her daily activities and work history support her claims regarding
her inability to function.  But Dr. Trulsen's report and Lovko's mental RFC assessment both note
that Bakke quit her jobs out of fear that she would be fired—this does not clearly exhibit a
determination to remain employed.  Both records also indicate that Bakke engaged in extensive
daily activities.  *See, e.g.*, *Roberson*, 481 F.3d at 1025 (finding that "caring for eleven-year-old
child, driving, fixing simple meals, doing housework, and shopping for groceries" were
"extensive daily activities" that did not support the claimant's alleged inability to work).

*see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("Ultimately, this Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.' A decision is not outside that 'zone of choice' simply because we may have reached a different conclusion had we been the fact finder in the first instance." (citations omitted)).  And an ALJ's "failure to elaborate is not reversible error so long as substantial evidence in the record supports his conclusion." *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 649 (8th Cir. 2004).  Here, while it may have been possible to draw a different conclusion regarding the severity of Bakke's condition, the ALJ's decision was nevertheless supported by substantial evidence on the record as a whole and the Court will not disturb that decision.

Even where a Court does determine that the Commissioner's denial of benefits was improper, the Court would generally remand the case to the ALJ for further administrative proceedings, rather than enter an immediate finding of disability.  *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) ("Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." (citation omitted)).  "Consistent with this rule, we may enter an immediate finding of disability only if the record 'overwhelmingly supports' such a finding."  *Id.* (citation omitted); *see also Ingram v. Barnhart*, 303 F.3d 890, 895 (8th Cir. 2002) ("When the Commissioner's decision to deny benefits is improper, we ordinarily will remand for further proceedings out of an abundance of deference to the agency's authority to make benefits determinations.").  Bakke asserts in her submissions to the Court that substantial evidence does not support the ALJ's decision, but at no point has Bakke asserted—nor would the Court find—that the record "overwhelmingly supports" a finding of disability in her case.  Nor did the magistrate judge make such a finding.  Here,

however, the Court has found that the ALJ's decision was supported by substantial evidence and the denial of benefits was not improper.  The Court therefore need not further address the appropriate standard for deciding whether to enter a finding of disability and award benefits rather than remand a case for further administrative proceedings.

Based on its review of the record, and for the reasons stated, the Court adopts the Report and Recommendation only with respect to the ALJ's 12.04 Listing determination and declines to adopt the Report and Recommendation [Docket No. 27] with respect to the ALJ's RFC and credibility determinations.  IT IS ORDERED THAT:

1.  Plaintiff's Motion for Summary Judgment [Docket No. 9] is DENIED.

2.  Defendant's Motion for Summary Judgment [Docket No. 23] is GRANTED.

3.  The Commissioner's decision is AFFIRMED and the case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 16, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge